UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CREEKSIDE EQUITY PARTNERS, LLC,

        Plaintiff,

                                Case No. 2:14-cv-1702
      v.                         JUDGE GREGORY L. FROST
                                Magistrate Judge Elizabeth P. Deavers

U.S. BANK NATIONAL ASSOCIATION,
et al.,

        Defendants.

## OPINION AND ORDER

This matter is before the Court for consideration of Defendants' motion to dismiss (ECF No. 15), Plaintiff's memorandum in opposition (ECF No. 19), and Defendants' reply memorandum (ECF No. 20). For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.

## I.      Background

According to the amended complaint, Plaintiff, Creekside Equity Partners LLC, is an Ohio company that owns a mixed-use development located in Gahanna, Ohio ("the Creekside property"). In December 2013, Plaintiff entered into a loan agreement with UBS Real Estate Securities Inc. ("UBS") in which UBS loaned Plaintiff $23,350,000. The loan was secured by a mortgage on the Creekside property. Section 6.9.1 of the loan agreement provided that Plaintiff would deposit "Achievement Funds" of $375,000 into an escrow account labeled the Achievement Reserve Account. Article VI of the loan agreement in turn called for Plaintiff to make monthly deposits into various other escrow accounts identified as the Additional Reserve

Accounts, which would fund repairs, capital improvements, and the like. The Achievement

Funds and the Additional Reserve Account funds are at the core of this lawsuit.

In March 2014, UBS assigned all of its rights in the loan agreement, the mortgage, the

Achievement Reserve Account, and the Additional Reserve Accounts to Defendant U.S. Bank

National Association ("U.S. Bank"), which serves as Trustee for the Benefit of the Holders of the

COMM 2014-UBS2 Mortgage Trust Commercial Mortgage Pass-Through Certificates.

Thereafter, on June 9, 2014, Plaintiff submitted a written request for disbursement of the

Achievement Funds to U.S. Bank's loan sub-servicer, Berkadia Commercial Mortgage LLC

("Berkadia"). Such disbursement is contemplated in Section 6.9.2 of the loan agreement, which

provides:

> Provided all of the Achievement Reserve Release Conditions are satisfied on or prior to December 5, 2015, Lender shall disburse to Borrower the Achievement Funds upon written request by Borrower and satisfaction by Borrower of each of the following conditions (collectively, the **Achievement Reserve Release Conditions**"):
>
> (a)    no Default or Event of Default shall have occurred and remain outstanding;
>
> (b)    the Multifamily Component has achieved an occupancy rate of at least 95.0%, as reasonably determined by Lender;
>
> (c)    the Debt Service Coverage Ratio based upon the trailing twelve (12) month period immediately preceding the date of such determination is greater than 1:30 to 1:0 for two (2) consecutive quarters, as determined by Lender;
>
> (d)    the Debt Yield based upon the trailing twelve (12) month period immediately preceding the date of such determination is equal to or greater than 9.0% for two (2) consecutive quarters, as determined by Lender;
>
> (e)    Borrower shall satisfy all of the Achievement Reserve Release Conditions set forth in this Section 6.9.1 on or prior to December 5, 2015;

2

(f)     Borrower shall deliver an Officer's Certificate certifying that all of the Achievement Reserve Release Conditions set forth in this <u>Section 6.9.1</u> have been satisfied; and

(g)     All reasonable costs and expenses incurred by Lender in connection with holding and disbursing the Achievement Funds shall be paid by Borrower.

(ECF No. 1-1, at Page ID # 124-25.)  Berkadia responded by requesting financials from Plaintiff and other information, and Plaintiff supplied that information on the same day it was requested.

Plaintiff again submitted the financial information on June 22, 2014, in addition to a new twelve month trailing financial report.  The next day, Berkadia told Plaintiff that Plaintiff had failed to satisfy the loan agreement's financial target requirements.  Plaintiff disagreed, but submitted additional, updated financial information on June 29, 2014, constituting a supplemental or second request for disbursement.  On July 2, 2014, a Berkadia Reserves Analyst told Plaintiff that Plaintiff's request had been approved and that, following approval by her manager, the funds would be released.

Two days later, Berkadia told Plaintiff that Berkadia was going to seek approval for the disbursement from Key Bank National Association ("Key Bank"), the Master Servicer.  Plaintiff responded by telling Berkadia that the failure to release the Achievement Funds was a default by U.S. Bank under the loan agreement.  Berkadia nevertheless transmitted the disbursement request to Key Bank the next day.  Several days after that, Plaintiff then learned that Berkadia was also seeking the approval of Defendant LNR Partners, LLC ("LNR"), the loan Special Servicer.

On July 11, 2014, Plaintiff received a Pre-Negotiation Letter Agreement from LNR.  This letter sought Plaintiff's agreement to various conditions for the disbursement, including: Plaintiff

would submit to expanded credit inquiries; Plaintiff would agree to be bound by Florida law with the exclusive venue of Miami, Florida; Plaintiff would pay LNR's attorneys' fees, inspection fees, and other negotiation-related fees; and Plaintiff would release LNR from any liability, claims, and demands caused by or relating to any loan communications.  Plaintiff responded that day by serving written notice that there was a breach of the loan agreement.

Over the next several days, various communications between Plaintiff and the other involved entities followed, with no resolution achieved.  Plaintiff placed a stop payment on its July 2014 loan payment.  Both UBS and Berkadia took actions to compel LNR to honor the disbursement request, but these efforts also proved unsuccessful.  LNR then told Plaintiff, through a communication delivered via Berkadia, that LNR would approve the disbursement request if Plaintiff made the July loan payment.  Plaintiff made the payment and requested waiver of any late fees associated with that payment.  Key Bank granted the waiver once Plaintiff agreed to automatic electronic withdrawals for future payments. LNR then twice requested additional information, some of which Plaintiff had already provided, and Plaintiff complied with the requests.  LNR declined to participate in an early August 2014 conference call involving the principals and instead made an additional request for information several days later.  Plaintiff provided the information requested, but no action occurred on the disbursement requests.

Plaintiff stopped payment on its August 2014 loan payment and provided written notice of default; Plaintiff also did not make its September 2014 payment.  U.S. Bank thereafter provided Plaintiff notice that the trustee considers Plaintiff to be in default of the loan agreement. As a result of the dispute over the Achievement Funds, U.S. Bank has also refused to release to

4

Plaintiff $87,819.48 of the Additional Reserve Account funds that Plaintiff requested in late August 2014 until the Achievement Funds dispute is resolved.

As of the filing of the November 2014 amended complaint, LNR has never communicated a definitive decision to Plaintiff on the June 2014 disbursement requests.  In the amended complaint, Plaintiff asserts two claims against U.S. Bank for breach of contract and the unlawful conversion of Plaintiff's funds, two claims against LNR for breach of fiduciary duty and tortious interference with contract, and one claim against both defendants for declaratory judgment.[1]  (ECF No 13 ¶¶ 61-92.)  Defendants have filed a motion to dismiss the amended complaint.  (ECF No. 15.)  The parties have completed briefing on the motion, which is ripe for disposition.

## II.     Discussion

### A.      Standard Involved

Defendants seek dismissal of the amended complaint for failure to state a claim upon which the Court can grant relief.  This Federal Rule of Civil Procedure 12(b)(6) attack requires the Court to construe the amended complaint in Plaintiff's favor, accept the factual allegations contained in that pleading as true, and determine whether the factual allegations present plausible claims.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007).  The United States Supreme Court has explained, however, that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported

---

[1]  Due to a choice of law provision in the loan agreement, New York law applies to the claims.

5

by mere conclusory statements, do not suffice." *Id.*  Consequently, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

To be considered plausible, a claim must be more than merely conceivable. *Twombly*, 550 U.S. at 556; *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007).  What this means is that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  The factual allegations of a pleading "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.  *See also Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008).

**B.    Analysis**

In Count I of the amended complaint, Plaintiff asserts a state law claim against U.S. Bank for breach of contract.  Under New York law, the elements of such a claim are (1) the existence of a contract, (2) Plaintiff's  performance, (3) U.S. Bank's breach, and (4) damages.  *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  Defendants initially seek dismissal of all counts of the amended complaint on the grounds that § 6.12.1 of the loan agreement bars the entire case. That section provides that "Lender shall have no obligation to release any of the Reserve Funds while any Default or Event of Default has occurred and remains outstanding."  (ECF No. 1-1, at Page ID # 127.)  The loan agreement definition of "Reserve Funds" includes the Achievement Funds.  (*Id.* at Page ID # 52.)  Thus, Defendants reason, dismissal is warranted because Plaintiff's multiple failures to make its loan payments and the existence of an impermissible February 2014 loan constitute events of default that permit retention of the Achievement Funds.

6

Plaintiff counters that the operative dates for disbursement purposes are the dates of the requests for disbursement, which means that Defendants' reliance on post-June 2014 failures to make payments or post-June 2014 liens improperly expands the scope of the relevant inquiry. Under this rationale, there were no events of default at the time Plaintiff sought disbursement that could relieve Defendants of the obligation to release the Achievement Funds. Plaintiff argues that Defendants' attempt to rely upon subsequent events to justify the earlier refusals to disburse conflates distinct events and departs from the meaning of the loan agreement.

The parties therefore disagree on the operative time frame of the relevant inquiry. Construing the plain terms of the loan agreement in conjunction with logic and common sense, this Court agrees with Plaintiff that Defendants' reliance on post-June 2014 events to establish default runs counter to the loan agreement. Accepting Defendants' view that § 6.12.1 "has no time qualifier and applies at the time of suit" would mean that any subsequent event of default could reach back in time retroactively so that even a prior disbursement is rendered unnecessary and could be nullified. (ECF No. 20, at Page ID # 795.) This is illogical. The loan agreement terms, when sensibly read in conjunction, present an agreement in which Defendants are excused from the disbursement obligation if Plaintiff is in default *at the time that obligation is to be fulfilled*. Defendants' theory imputes a broad temporal scope to § 6.12.1 that is simply not within that provision's language.

In fact, § 6.12.1 contains a time qualifier. This caveat provision is contingent on a specific set of conditions existing at a set point in time. It contemplates a future set of circumstances ("Lender *shall* have no obligation to release any of the Reserve Funds") that exists at a set point in time at which a past dispositive event has already taken place and remains in

existence ("*while* any Default or Event of Default *has* occurred and *remains* outstanding").  In other words, the loan agreement ties the excusal from disbursement to a past event that still exists at the time there would otherwise be an obligation to disburse.

Finally, U.S. Bank argues that dismissal is warranted because § 6.9.2 of the loan agreement does not mandate instantaneous disbursement upon request, but instead contemplates a built-in period in which the Trustee will determine the right to disbursement.  This would mean that any event of default that occurs within the determination period would cut off the right to disbursement.  Two comments are necessary.  First, such an argument turns in large part on the facts and who was doing what, when, and why.  Such inquiries highlight why this argument is inappropriate for a Rule 12(b)(6) motion.  Second, although U.S. Bank urges this Court to accept that there is no express time limitation on the determination period that would keep the time-to-perform window open, § 6.9.2 can also be read in a number of ways.  It might establish a mandated disbursement upon satisfaction of all relevant conditions and written request, regardless of subsequent breach during verification, or it might carry an imputed reasonableness component to the amount of time the lender can spend making its determination.  Neither reading supports a Rule 12(b)(6) dismissal.

None of this means that post-June 2014 events cannot constitute events of default that would relieve Defendants of a current or future disbursement obligation.  Rather, the Court concludes that based on the pleadings, these events cannot retroactively present cause for excusing disbursement under § 6.12.1 at the time of the June 2014 requests.  The events may excuse Defendants from disbursing funds from August 2014 onward, but that is an issue for

another day. Today's inquiry is simply whether Plaintiff has pled plausible claims, and the refusal to make a June 2014 disbursement is actionable.

Plaintiff also disagrees that the February 2014 lien presents a default. Section 10.1(x) of the loan agreement provides in relevant part that an event of default exists "if Borrower shall be in default beyond any applicable cure periods under any agreement (other than the Loan Documents) creating a Lien on the Property or any party thereof." (ECF No. 1-1, at Page ID # 142.) The loan agreement in turn defines "Borrower" to mean "Creekside Equity Partners LLC . . . together with its permitted successors and assigns." (*Id.* at Page ID # 24.) This matters because the February 2014 lien upon which U.S. Bank relies arose in relation to a contract between a broker and Creekside Investment Partners LLC. There is no factual allegation pled that places Creekside Investment Partners LLC into the definition of Borrower, which means that the February 2014 lien does not appear to constitute an event of default. Whether this analysis would stand in a summary judgment context involving proof of facts does not matter to today's disposition; the point here is that accepting all factual allegations as true, there is no basis for treating the February 2014 lien as an event of default.

In addition to the overarching barred action argument, U.S. Bank also seeks dismissal of Count I on the grounds that Plaintiff has not plausibly alleged that it performed under the loan agreement or that U.S. Bank breached that agreement. The factual allegations of the amended complaint, which this Court must necessarily accept as true, indicate that at the time of the June 2014 disbursement requests, Plaintiff had performed. This conclusion accepts that the February 2014 lien does not constitute a default as discussed above. U.S. Bank nevertheless argues that

Plaintiff cannot sue for breach of contract because Plaintiff has itself breached the contract by withholding loan payments.

To support this argument, U.S. Bank relies on that portion of § 11.19 of the loan agreement that provides that "[n]o failure by Lender to perform any of its obligations hereunder shall be a valid defense to, or result in any offset against, any payments which Borrower is obligated to make under any of the Loan Documents." (ECF No. 1-1, at Page ID # 154.) This selective excerpt ignores both the plain language and the context of that loan agreement section, which provides in its entirety:

> **Section 11.19   Waiver of Offsets/Defenses/Counterclaims.**  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents or otherwise to offset any obligations to make the payments required by the Loan Documents.  No failure by Lender to perform any of its obligations hereunder shall be a valid defense to, or result in any offset against, any payments which Borrower is obligated to make under any of the Loan Documents.

(ECF No. 1-1, at Page ID # 154.)  Construed correctly, it is apparent that § 11.19 is a borrower-must-continue-to-pay provision, not a bar to a breach of contract claim.

The first sentence of § 11.19 means that if U.S. Bank or its agents sue Plaintiff, Plaintiff cannot stop paying on the loan.  The second sentence means that Plaintiff must make its loan payments even if U.S. Bank breaches the loan agreement.  Neither of these sentences means that Plaintiff cannot bring its breach of contract claim against U.S. Bank.  What they do mean is that U.S. Bank can possibly bring a counterclaim against Plaintiff here for the missed payments since August 2014.  U.S. Bank's argument for dismissal based on § 11.19 therefore incorrectly expands the purpose and effect of that section.

Plaintiff also opposes dismissal on the theory that Defendants' entire Rule 12(b)(6) motion is predicated on this Court making premature (and at this stage, impermissible) factual determinations regarding the validity of the amended complaint's factual allegations.  Plaintiff directs this Court to the factual allegations pled that support satisfaction of each of the § 6.9.2 prerequisites to disbursement as of the June 2014 requests.  In light of the foregoing, this Court agrees with Plaintiff that its allegations, necessarily accepted as true in this Rule 12(b)(6) context, present a plausible breach of contract claim arising from performance by Plaintiff and breach by U.S. Bank.  The Trustee's argument for dismissal of Count I fails.

Count II of the amended complaint is a conversion claim against U.S. Bank.  Under New York law, "[c]onversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property."  *Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 53-54 (2d Cir. 1993) (quoting *Meese v. Miller,* 79 A.D.2d 237, 436 N.Y.S.2d 496, 500 (App. Div. 1981)).  In order to establish conversion, Plaintiff must show "legal ownership of a specific identifiable piece of property and the defendant's exercise of dominion over or interference with the property in defiance of the plaintiff's rights."  *Ahles v. Aztec Enters., Inc.*, 120 A.D.2d 903, 903, 502 N.Y.S.2d 821, 822 (App. Div. 1986).

U.S. Bank argues that Count II fails to state a claim upon which this Court can grant relief because a party cannot bring a conversion claim to recover escrowed funds based on an underlying breach of contract.  This Court agrees.  It is well settled that "under New York law, a claim of conversion cannot be predicated on a mere breach of contract."  *Robotic Visions Sys.,*

11

*Inc. v. Cybo Sys., Inc.*, 833 F. Supp. 189, 192 (E.D. N.Y. 1993).  *See also Karmilowicz v. Hartford Fin. Servs. Group, Inc.*, 494 F. App'x 153, 158 (2d Cir. 2012).  The conversion claim must stem from a wrong that is independent of the purported breach of contract.  *Karmilowicz*, 494 F. App'x at 158.  Thus, "to sustain a conversion claim, a plaintiff must allege acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual rights." *Fraser v. Doubleday & Co.*, 587 F. Supp. 1284, 1288 (S.D.N.Y. 1984).

Plaintiff apparently relies on the fact that the withheld funds are escrow funds to distinguish the foregoing precedent.  Plaintiff is correct that money can be the property at issue in a conversion claim, provided the money is "held in a 'specific, identifiable fund and [subject to] an obligation to return or otherwise treat in a particular manner the specific fund in question.' " *Citadel Management, Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133, 147 (S.D.N.Y. 2000) (quoting *High View Fund, L.P. v. Hall*, 27 F. Supp. 2d 420, 429 (S.D.N.Y. 1998)).  But Plaintiff has directed this Court to no authority, and this Court can find none in New York law, that would remove the conversion claim escrow funds at issue here from the rule that more than a breach of contract must be involved.  To the contrary, this Court has found authority in which courts applying New York law dismissed a conversion claim involving escrowed funds when a breach of contract claim also existed.  *See, e.g., Newman v. Mor*, No. 08 CV 658(RJD) (CLP), 2009 WL 890552, at *4 (E.D.N.Y. Mar. 31, 2009); *Amadasu v. Ngati*, No. 05CV2585(JFB)(LB), 2006 WL 842456, at *11 (E.D.N.Y. Mar. 27, 2006).  Accordingly, dismissal of Count II is warranted.

In Count III of the amended complaint, Plaintiff asserts a state law claim against LNR for breach of fiduciary duty.  Under New York law, a party seeking to sustain such a claim must

prove the existence of a fiduciary relationship, misconduct by the defendant, and damages directly caused by the defendant's misconduct. *Margrabe v. Sexter & Warmflash, P.C.*, 353 F. App'x 547, 549 (2d Cir. 2009). LNR argues that dismissal is warranted because Plaintiff has failed to plead any facts that point to a requisite fiduciary relationship between Plaintiff and LNR.

Plaintiff disagrees and directs this Court to various states' laws to support its position. But New York law applies and provides that, as a standard rule, " '[a]n arm's length borrower-lender relationship is not of a confidential or fiduciary nature.' " *Roswell Capital Partners LLC v. Alt. Constr. Tech.*, 638 F. Supp. 2d 360, 368 (S.D.N.Y. 2009) (quoting *River Glen Assocs., Ltd. v. Merrill Lynch Credit Corp.*, 295 A.D.2d 274, 275, 743 N.Y.S.2d 870, 871 (1st Dep't 2002)). It is only when a special relationship exists that "[a] lender-borrower relationship may give rise to a fiduciary duty," such as "where there exists 'a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding, or an assumption of control and responsibility.' " *Id.* at 368-69 (quoting *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993)). The amended complaint sets forth no such special relationship and in fact disputes that LNR is properly involved in the disbursement issue in any way, regardless of the delegation of duties provision contained in the loan agreement. Consequently, dismissal of Count III is also warranted. Having reached this conclusion, the Court need not and does not address LNR's alternative rationale for dismissal.

Count IV of the amended complaint is a tortious interference with contract claim against LNR. Under New York law, the elements of such a claim are "(1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract';

13

(3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.' " *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375, 646 N.Y.S.2d 76, 82 (1996)). *See also Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 278 (S.D.N.Y. 2002) (quoting *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996)).

LNR initially argues that dismissal of Count IV is warranted because there has been no breach of the contract. The Court has already discussed and rejected such a proposition for Rule 12(b)(6) purposes in regard to Count I. This leads into LNR's second ground for dismissal, specifically, that as an agent of U.S. Bank, LNR cannot be liable for inducing any purported breach of the loan agreement.

New York law provides that "[a]n agent cannot be held liable in tort for inducing his principal to breach a contract, unless he is operating outside the scope of his authority." *Aim Int'l Trading, L.L.C. v. Valcucine S.P.A., IBI, L.L.C.*, No. 02 Civ. 1363(PKL), 2003 WL 21203503, at *10 (S.D.N.Y. May 22, 2003). *See also Solow v. Stone*, 994 F. Supp. 173, 181 (S.D.N.Y. 1998). Liability can also exist if the agent committed an independent tortious act against a plaintiff. *Friedman v. Wahrsager*, 848 F. Supp. 2d 278, 298 (E.D.N.Y. 2012). The rule against agent liability rule is "consistent with the principle that a defendant cannot tortiously interfere with a contract if he is not a 'third part[y] unrelated to the contract.' " *Solow*, 994 F. Supp. at 181. Thus, where "[t]he complaint contains no allegation that [an agent] acted outside

14

the scope of his agency . . . the tortious interference claim[] must be dismissed." *Aim Int'l Trading, L.L.C.*, 2003 WL 21203503, at *10.

Here, the amended complaint identifies LNR as a Special Servicer while also characterizing LNR's involvement as improperly injecting itself into the disbursement issue. This latter characterization arguably ignores that LNR's status as Special Servicer means it was acting as an agent of U.S. Bank, the lender by assignment, and as such might not be a third party unrelated to the loan agreement. This leads to the question of whether Plaintiff has pled facts plausibly suggesting that LNR acted outside the scope of its agency.

Under New York law, "actions deemed to be outside the scope of authority include those that are committed independently for personal pecuniary gain . . . or are derived solely from malice." *Barsoumian v. Univ. at Buffalo*, No. 06-CV-831S, 2012 WL 930331, at *9 (W.D.N.Y. Mar. 19, 2012). The parties agree that Plaintiff has pled that LNR was acting in its own economic self-interest; what the parties disagree over is whether such allegations save Count IV from dismissal.

It is a close call. New York law provides that where a third party has an economic interest in the contract, a plaintiff must make a higher showing than the basic elements of the tortious interference tort; the third party's interference has to have been " 'either malicious or involved conduct rising to the level of criminality or fraud.' " *Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 431 (S.D.N.Y. 2007) (quoting *Masefield AG v. Colonial Oil Indus.*, No. 05 Civ. 2231(PKL), 2006 WL 346178, at *5-6 (S.D.N.Y. 2006)). The crux of Plaintiff's pleading is that

LNR acted as it did because it would profit from a default by Plaintiff.  LNR argues that Plaintiff's use of purportedly unnecessary information requests by LNR to establish malice fails to amount to anything more than an alleged absence of good faith, which LNR asserts is insufficient.

This Court finds some guidance in *Momentive Performance Materials USA, Inc. v. AstroCosmos Metallurgical, Inc.*, No. 107-CV-567 (FJS/DRH), 2009 WL 1514912 (N.D.N.Y. June 1, 2009).  In that case, another federal judicial officer addressed a Rule 12(b)(6) motion to dismiss a claim for tortious interference with contract under New York law.  *Id.* at *5.  The moving defendant asserted that it could not be liable for procuring another defendant's breach of a contract because of the economic interest defense.  *Id.*  LNR also invokes this defense, and the parties devote a fair amount of the briefing to the defense.  But as *Momentive Performance* explained, such briefing is arguably unhelpful at this juncture in the case:

> Defendant CLEGC relies on two interrelated theories to support its motion to dismiss both of Plaintiff's tortious interference claims: (1) the economic interest defense and (2) the defense that, because Defendant CLEGC and Defendant AstroCosmos are sister companies, Plaintiff cannot hold Defendant CLEGC liable for interfering with the contractual and/or business relationship between GE and Defendant AstroCosmos because any such interference results from Defendant CLEGC's attempt to protect its own economic interests.
>
> The fatal flaw of relying on either of these theories to support a motion to dismiss is that they are **defenses** to Plaintiff's claims, on which Defendant CLEGC has the burden of proof.  In considering this motion to dismiss, however, the Court must accept as true all of the well-pleaded allegations in Plaintiff's amended complaint and draw all reasonable inferences in Plaintiff's favor.  Thus, as long as Plaintiff's allegations are sufficient to state facially plausible claims for tortious interference, the Court cannot grant Defendant CLEGC's motion to dismiss based on Defendant CLEGC's mere assertion of the business justification defense.

16

*Id.* at *5-6. The judicial officer in *Momentive Performance* later explained:

> [A] defendant cannot defeat a tortious interference claim simply by asserting an economic interest defense. Rather, the defendant has to prove that the defense applies, i.e., that, even assuming that the defendant is affiliated with the party with whom the plaintiff has the relationship, the defendant interfered with that relationship to protect its economic interest. Furthermore, once the defendant meets its burden to prove that the economic interest defense applies, the plaintiff can still prevail if it can prove that the defendant acted out of malice or fraudulently or illegally interfered with the contractual or business relationship.
>
> Furthermore, Defendant CLEGC appears to overlook the fact that there is no legal support for the proposition that the mere assertion of the economic justification defense or the fact that Defendant CLEGC and Defendant AstroCosmos are affiliated companies, as a matter of law, defeats Plaintiff's tortious interference claims. In addition, there is a factual dispute about the relationship between Defendant CLEGC and Defendant AstroCosmos that the Court cannot resolve on a motion to dismiss, particularly since it is Defendant CLEGC's burden to prove that such a relationship exists and the extent of that relationship. Moreover, Defendant CLEGC bears the burden to prove that it interfered with GE's contractual and/or business relationship with AstroCosmos to protect its own economic interest. Finally, assuming that Defendant CLEGC meets this burden, Plaintiff may still be able to overcome this defense if it can prove that Defendant CLEGC acted out of malice or employed fraudulent or illegal means to interfere with the relationship between GE and Defendant AstroCosmos.

*Id.* at *8 (footnote omitted). This rationale is instructive.

In the case *sub judice*, Plaintiff has pled that LNR was acted for its own personal pecuniary gain. LNR in turn has asserted the economic interest defense. The pleading indicates that LNR was a Special Servicer, which points to agency, but there are no facts pled about the scope of that agency. It is LNR's burden to prove the existence and extent of an agency relationship. All of this and more point to the fact that dismissal of Count IV is not warranted at this time. This conclusion expresses no ultimate opinion on any of these issues, but is instead the

17

result of the Rule 12(b)(6) inquiry in which this Court must engage and the specific pleading involved here.

In Count V of the amended complaint, Plaintiff asserts a claim for declaratory judgment. Defendants seek dismissal of this final claim on the grounds that it merely rehashes four other defectively pled claims.[2]  At the same time, Defendants also argue in their briefing that the Court should dismiss all of the first four claims because the loan agreement provides that in the event if a lawsuit, Plaintiff is limited to seeking injunctive relief or declaratory judgment.

Defendants are of course incorrect that all four of the preceding claims fail today. Additionally, at least one case applying New York law suggests that the Court is not required to address conclusively the sole remedy provision of the loan agreement at this early stage in the litigation.  *See Ace Secs. Corp. Home Equity Loan Trust, Series 2007-HE3 v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 557 (S.D.N.Y. 2014).  This Court declines to dismiss Count V.

### III.     Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss.  (ECF No. 15.)  Counts II and III are dismissed.  Count I, IV, and V remain pending.

**IT IS SO ORDERED.**

_____ /s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE

---

[2]   In a footnote in their briefing, Defendants also ask this Court to dismiss various forms of relief sought by Plaintiff, to deny Plaintiff's demand for attorney's fees and costs, and to strike Plaintiff's demand for a jury trial.  Defendants thus improperly attempt to expand the scope of a Rule 12(b)(6) motion by utilizing the wrong mechanism to pursue these ends or by overreaching.